Filed 2/16/16  Spann v. Aerovironment CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| EILEEN SPANN, | B259952 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC523741) |
| v. | |
| AEROVIRONMENT INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Barbara Ann Meiers, Judge.  Affirmed.

Law Offices of Kathy F. Bernick and Kathy F. Bernick; Gusdorff Law and Janet Gusdorff for Plaintiff and Appellant.

Paul Hastings, James A. Zapp, Cameron W. Fox and Ji Hae Kim for Defendant and Respondent.

Plaintiff Eileen Spann appeals from a summary judgment in favor of her former employer, defendant Aerovironment, Inc. (Aerovironment). Spann urges that there are triable issues of material fact as to whether Aerovironment subjected her to unlawful discrimination and retaliation in violation of the Fair Employment and Housing Act (FEHA), Government Code section 12920 et seq.[1]

We affirm. As we now discuss, there is no evidence from which a reasonable trier of fact could infer that Spann was not promoted or was terminated because she is female or because she complained about gender discrimination. Accordingly, summary judgment was properly granted for Aerovironment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.

### Spann's Request to Be Promoted to
### Manufacturing Engineering Manager

Aerovironment is a defense contractor located in Simi Valley, California. Spann was a Senior Manufacturing Engineer in Aerovironment's Unmanned Aircraft Systems (UAS) Division from August 2009 to May 2013, when she was terminated as part of a companywide reduction-in-force.

In May 2011, Spann's immediate supervisor, Steve Myers, left his position as Manufacturing Engineering Manager. Immediately thereafter, Vice President Jon Self appointed Shawn Webb, a director for another project, as "acting manager" of the manufacturing engineering department in addition to his existing responsibilities.[2] Webb remained the acting Manufacturing Engineering Manager until April 2012.

In October 2011, Spann initiated a meeting with Self to discuss her interest in the Manufacturing Engineering Manager position. Self testified that at the time he met with Spann, the position was not open; he explained that the company was "going through some consolidation of all of our organizations" and he had not yet determined whether he

---

[1]     All subsequent statutory references are to the Government Code.

[2]     Spann testified that in the company hierarchy, a director was senior to a manager.

2

would replace Myers or shift the Manufacturing Engineering Manager responsibilities to an existing manager or director. Nonetheless, Self agreed to meet with Spann because "I have an open door policy. I take meetings from all employees."

Spann and Self had different accounts of the October 2011 meeting. Self testified that he asked Spann about her qualifications because it was a "question [he] would ask anybody asking for a career opportunity or interview for a position." At the meeting's conclusion, he told Spann that "if I decide to post the position and there is an opening, [you're] welcome to apply."

Spann agreed Self asked about her qualifications, but she perceived Self's tone to be demeaning. According to her declaration, "Self first asked me what made me qualified for this position. There was nothing wrong with the content of the question but Self's tone of voice, body language and facial expression indicated to me that he did not believe I was qualified." Spann said Self told her the position was not then open, but that she could apply for it "*when* it became available." (Italics added.)

Ultimately, Self decided not to hire a new Manufacturing Engineering Manager, instead transferring the manufacturing engineering management responsibilities to a newly hired Director of Quality. Spann asserts that had she known of the opening for the Director of Quality position, she would have applied for it.

## II.

### Spann's Complaints of Gender Discrimination to
### Human Resources Manager Dawnette Sitler

On October 17, 2011, days after her meeting with Self, Spann met with Human Resources Manager Dawnette (Beery) Sitler. Spann told Sitler that Self thought her unqualified for the Manufacturing Engineering Manager position, an attitude that Spann attributed to company-wide anti-female bias. At that initial meeting and subsequently, Spann complained to Sitler that male engineers were publicly recognized for their work, but female engineers were not; female engineers were assigned more work than male

engineers; and female engineers were treated rudely by male engineers, who knew they "did not have to cooperate with women."[3]

Sitler interviewed the individuals who were involved in or witness to the incidents Spann complained about, and she reviewed the documents Spann provided her. Sitler said she spent at least 10 hours meeting with or communicating with Spann and investigating her complaints. Based on that investigation, Sitler did not find any evidence to support Spann's claims of gender bias.

In December 2011, acting Manufacturing Engineering Manager Webb announced that he "would like to roll out a rotational program for the Manufacturing Engineering group to give all those that have expressed interest in [a] leadership role a chance. The

---

[3]    Spann provided the following examples, among others: "I asked Perez, [a male manufacturing engineer], a question in his cubicle. He kept his back to me, staying seated and facing his computer monitor. On another occasion I asked Perez for help and he refused. I asked [Production Supervisor Todd] Marshall a question on the floor. He walked away. His supervisor, [Peter] Crescenti, was there and did nothing. On another occasion Marshall looked like he was holding a door open for me but he closed it right as I got there. On another occasion I asked Marshall a question and he gave me incorrect information . . . . On another occasion I asked Marshall a question and he told me that I should know the answer. He did not tell me if he knew. I told him I did not know. He then sent me an egregious e-mail accusing me of having others do my work."

Spann continued: "I had been experiencing discrimination since I started at [Aerovironment]. . . . I told [Dawnette] Sitler that I had sent Chris Fisher, [Production Engineering] Manager for Wasp IV, 3 e-mails telling him and made one phone call to tell him I was finished with [a presentation] he asked me to do, that he did not get back to me and instead pulled me off the project. This was discrimination. Instead of getting Fisher to change his mind [Sitler] told me that I should have gone to his building when he did not return my e-mails or answer my phone call. Fisher got away with that. [Citation.] When I complained about [a coworker] yelling at me . . . , which was discrimination, Sitler did not ask him to apologize. [Citation.] When [Bud] Jenkins would not give me public recognition for my Quality Metrics work, more discrimination, Sitler did not put up a fight, made no real attempt to change his mind. Sitler allowed my not getting credit in my second [performance evaluation] for my work with PUMA Lean project. [Citation.] . . . . Sitler did nothing to change the discriminatory environment at [Aerovironment] or the acting out of the obvious animus towards women by male engineers and managers."

4

goal will be to rotate to a new lead every 3 (or so) months, providing a chance to those that have or will express interest." Spann was selected to be the manufacturing engineering lead for the period January through March 2012.

**III.**

**Spann's EEOC and DFEH Complaints;**

**Aerovironment's Investigation of Spann's Claims by**

**Outside Investigator Sally Phillips**

In May or June 2012, Spann filed a discrimination charge with the Equal Employment Opportunity Commission (EEOC) and the California Department of Fair Employment and Housing (DFEH). Thereafter, Aerovironment hired outside investigator Sally Phillips to investigate Spann's claims.

Phillips reviewed documents and interviewed Spann, her current and former supervisors, Dawnette Sitler, and two female manufacturing engineers, among others. Phillips then prepared a report, dated July 2012, detailing her findings. The report stated as follows.

Spann's former supervisor, Steve Myers, told Phillips that he had become frustrated with Spann because he felt she was not doing her job. He said that just prior to leaving the manufacturing engineering department, he gave Spann a "mini-review" that he characterized as a final warning that she needed to improve her performance. He described Spann as a "non-performer," noting that she did not do the work she was assigned. He said Spann was a huge "demotivator" among her peers and he did not believe Aerovironment should employ Spann in any capacity. Myers also said that while at Aerovironment, he had hired seven women and eight men, and he had advanced one man and one woman to higher pay grades.

Another of Spann's former supervisors, Shawn Webb, told Phillips that five members of his team had reported that while acting as manufacturing engineering lead, Spann was detached, aloof, and did not do much work herself. He believed Spann was seeking company-wide recognition for simply doing her job. He said the other women in Spann's group did excellent work.

5

Spann's current supervisor, Bud Jenkins, told Phillips that when he first came to work for Aerovironment, about eight weeks before the interview, he met one-on-one with each member of his group. Several group members, both men and women, told him Spann was difficult to work with, was condescending, and did not listen when others spoke. Jenkins did not feel he could pass judgment on Spann because he had worked with her for only a brief period.

Production Supervisor Todd Marshall told Phillips that Spann was very difficult to work with. He described her as combative and said she tended not to complete the work assigned to her. Instead, she "simply forces her workload on everyone else." He said he had no problem working with women, and he described Spann's female peers, Ashley Harrier and Laurie Morrow, as bright, helpful, proactive, organized, and easy to work with.

Manufacturing Engineer Ashley Harrier told Phillips that Spann shirked her responsibilities and pushed them on to others. She said Spann often let necessary procedures sit for weeks and then would claim that someone else should be responsible for them. Harrier did not believe that Spann's workload or her own had increased or that women were treated differently than men at Aerovironment. She believed Spann was treated differently because she was difficult to work with, not because she was female.

Manufacturing Engineer Laurie Morrow said Spann was bizarre and difficult to work with. Morrow did not believe she (Morrow) was treated any differently because she was a woman. Morrow thought she generally was well regarded, noting that she had been offered a supervisory role but had turned it down because she enjoyed the work she was doing.

Technical Writer Lisa Nason said she had not had any problems with Spann. Nason said that although the aerospace industry was male-dominated, she had not experienced any sexual bias at Aerovironment. She felt that she was treated with respect at Aerovironment and had received positive feedback from her male counterparts.

The Phillips report concluded that there "does not appear to be any factual basis for Spann's claim of sexual bias." It noted that "Spann's female peers all denied seeing

6

or experiencing sexual bias. They believe they are treated fairly and no differently than the males. They also believe that to the extent Spann feels she is treated differently, it is due to her failure to perform and her attitude, rather than her sex." Further, "all of Spann's managers (Myers, Webb and now Jenkins) have expressed frustration with Spann's communication style and work ethic. According to [Spann's supervisors], Spann's peers and customers have also expressed the same frustrations. [Coworkers] all described Spann similarly – as being difficult to work with and not getting the work done." The report noted, however, that Spann had not been made fully aware of these issues, in part because of the changes in management: "With each new manager, Spann appears to be given a 'clean slate'. . . . [As a result, Spann] has developed her own 'false impression' that she is an excellent employee and qualified for management. Spann's apparent lack of awareness of her own failings may also have further fueled her belief that if she is not qualified as a manager, it is through no fault of her own, but rather the fault of management in not spreading the word about her work."

On about July 20, 2012, Phillips met with Spann and Sitler to report that she had not found any evidence of gender bias. Spann disagreed with Phillips' findings and continued to assert that she had been the victim of gender bias.

## IV.

## Spann's 2013 Termination

In 2012, several of Aerovironment's major projects ended, and the company experienced a significant reduction in demand for its UAS products. In September 2012, the managers of the engineering and manufacturing groups were asked to rank their employees according to a fixed set of criteria, and the following month, about 36 employees, including 22 from the UAS division, were laid off. No manufacturing engineers were laid off at that time.

In 2013, the company experienced a further reduction in demand for its UAS products, and it again asked the manufacturing and engineering managers to rank their employees. Jenkins evaluated the five manufacturing engineers in his group—Spann, Sergio Perez, David Naillon, Dale Curtis, and Laurie Morrow—based on input "from

7

peers, other managers, . . . [his] review of daily activity logs, and . . . [his] own observations." Laurie Morrow, the other female engineer in the group, received the highest overall score of 3.3. David Naillon, Sergio Perez, and Dale Curtis received scores of 3.2, 3.2, and 3.1, respectively. Spann received a score of 2.0, the lowest score of the group.

Based on the rankings, Jenkins recommended Spann for layoff. His recommendation was reviewed and approved by Self, the UAS "leadership team," and Senior Vice President of Administration Cathleen Cline. Spann was laid off in May 2013, along with 56 other employees, including 30 from the UAS division.

In September 2013, Aerovironment engaged in another round of layoffs, terminating 46 employees, all from the UAS division.

## V.

### The Present Action

Spann filed a complaint with the DFEH in September 2013, and filed the present action against Aerovironment on October 8, 2013.[4] The complaint asserted that there "was a pattern and practice of gender discrimination at [Aerovironment] and in particular in the Manufacturing Engineering Department where women engineers were treated differently than male engineers." The complaint further asserted that female engineers faced "bias and hostility from male engineers who would not cooperate with them, creating a hostile work environment. Management was aware of this but would do nothing to correct this."

The complaint alleged that as part of an alleged pattern and practice of gender discrimination, Aerovironment eliminated the position of Manufacturing Engineering Manager "to avoid giving it to [Spann] or to any other woman." When Spann complained of pervasive gender bias, Aerovironment retaliated by giving her a poor

---

**4** In July 2013, Spann received a right to sue letter from the EEOC in connection with her first discrimination complaint. In September 2013, she received a right to sue letter from the DFEH in connection with her second discrimination complaint.

performance review and subsequently terminating her. The layoff was retaliatory in that Spann "was more qualified than other engineers who were not laid off."

Spann alleged that this alleged discriminatory and retaliatory conduct gave rise to four causes of action: (1) gender discrimination; (2) retaliation; (3) wrongful termination; and (4) failure to prevent discrimination and retaliation.

## VI.

### Aerovironment's Motion for Summary Judgment

Aerovironment moved for summary judgment or, in the alternative, summary adjudication of issues. Aerovironment presented declarations and documentary evidence of a nondiscriminatory reason for failing to promote Spann to Manufacturing Engineering Manager—namely, that the company decided not to replace Myers but, instead, to transfer his responsibilities to a newly-hired Director of Quality. Spann never applied for the Director of Quality position, and thus she could not establish that Aerovironment failed to promote her to that position for discriminatory reasons. With regard to Spann's retaliation claim, Aerovironment presented evidence that it laid off Spann because of a reduced demand for its products and because Spann was the lowest ranked manufacturing engineer in her group.

Spann opposed the motion. In support, she submitted her own declaration describing the discrimination to which she believed she had been subject, as well as the declarations of three female former colleagues who said they found Spann to be "friendly, nice and warm," and had not found her to act superior to others.

The court granted Aerovironment's motion for summary judgment on September 15, 2014, finding that "there is no material issue of fact presented by competent evidence that would impede defendants' right to a judgment in its favor as a matter of law."

### DISCUSSION

Spann contends that the trial court erred in summarily adjudicating her FEHA claims against Aerovironment—for (1) gender discrimination, (2) retaliation, and

9

(3) failure to prevent discrimination and retaliation. (§ 12940, subds. (a), (h), (k).)[5] We address these issues below.

## I.

## The *McDonnell Douglas* Burden-Shifting Framework

"In cases alleging employment discrimination, we analyze the trial court's decision on a motion for summary judgment using a three-step process that is based on the burden-shifting test that was established by the United States Supreme Court for trials of employment discrimination claims in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792. (See, e.g., *Guz* [*v. Bechtel National, Inc.* (2000)] 24 Cal.4th [317,] 354-355 [(*Guz*)]; *Reeves v. Safeway Stores, Inc*. (2004) 121 Cal.App.4th 95, 111 (*Reeves*).) . . . [¶] . . . [U]nder the first step of the *McDonnell Douglas* framework, the plaintiff may raise a presumption of discrimination by presenting a 'prima facie case,' the components of which vary depending upon the nature of the claim . . . . (*Reeves*, *supra*, 121 Cal.App.4th at pp. 111-112.) 'A satisfactory showing to this effect gives rise to a presumption of discrimination which, if unanswered by the employer, is mandatory—it requires judgment for the plaintiff.' (*Id*. at p. 112, citing *Guz*, *supra*, at pp. 355-356.) However, under the second step of the test, 'the employer may dispel the presumption merely by articulating a legitimate, nondiscriminatory reason for the challenged action. [Citation.] At that point the presumption disappears.' (*Reeves*, at p. 112.) Under the third step of the test, the 'plaintiff must . . . have the opportunity to attack the employer's proffered reasons as pretext for discrimination, or to offer any other evidence of discriminatory motive.' (*Guz*, *supra*, at p. 356.)

"The *McDonnell-Douglas* framework is modified in the summary judgment context. In a summary judgment motion in 'an employment discrimination case, the

---

[5]     The trial court also summarily adjudicated Spann's cause of action for wrongful termination. Spann does not assert on appeal that summary adjudication of the wrongful termination claim was erroneous, and thus any such contention is forfeited. (E.g., *Tellez v. Rich Voss Trucking, Inc*. (2015) 240 Cal.App.4th 1052, 1066 ["On appeal we need address only the points adequately raised by plaintiff in [the] opening brief on appeal."].)

employer, as the moving party, has the initial burden to present admissible evidence showing either that one or more elements of plaintiff's prima facie case is lacking or that the adverse employment action was based upon legitimate, nondiscriminatory factors.' (*Hicks v. KNTV Television, Inc*. (2008) 160 Cal.App.4th 994, 1003, citing *Guz*, *supra*, 24 Cal.4th at p. 357.) . . .

" '[I]f nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citations.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, "legitimate" reasons [citation] in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of *discrimination*.' (*Guz*, *supra*, 24 Cal.4th at p. 358, original italics.) Examples of legitimate reasons are a failure to meet performance standards (*Trop v. Sony Pictures Entertainment Inc*. (2005) 129 Cal.App.4th 1133, 1149) or a loss of confidence in an employee (*Arteaga v. Brink's, Inc*. (2008) 163 Cal.App.4th 327, 352.) . . . .

"In *Guz,* the Supreme Court emphasized that 'the great weight of federal and California authority holds that an employer is entitled to summary judgment if, considering the employer's innocent explanation for its actions, the evidence as a whole is insufficient to permit a rational inference that the employer's actual motive was discriminatory.' (*Guz*, *supra*, 24 Cal.4th at p. 361, fn. omitted.) It is not sufficient for an employee to make a bare prima facie showing or to simply deny the credibility of the employer's witnesses or to speculate as to discriminatory motive. (*Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1004 (*Hersant*); *Wallis v. J.R. Simplot Co*. (1994) 26 F.3d 885, 890; *Compton v. City of Santee* (1993) 12 Cal.App.4th 591, 595-596.) Rather it is incumbent upon the employee to produce 'substantial responsive evidence' demonstrating the existence of a material triable controversy as to pretext or discriminatory animus on the part of the employer. (*University of Southern California v. Superior Court* (1990) 222 Cal.App.3d 1028, 1039; *Martin* [*v. Lockheed*

11

*Missiles & Space Co.* (1994)] 29 Cal.App.4th [1718,] 1735.)" (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 860-862.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained. [Citation.] Under California's traditional rules, we determine with respect to each cause of action whether the defendant seeking summary judgment has conclusively negated a necessary element of the plaintiff's case, or has demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial, such that the defendant is entitled to judgment as a matter of law." (*Guz*, *supra*, 24 Cal.4th at p. 334.)

## II.

### Discrimination and Failure to Prevent Discrimination

The complaint alleges that Aerovironment violated section 12940, subdivision (a), by failing to promote Spann because of her gender. On appeal, Spann contends that the trial court erred in concluding that there were no triable issues of material fact as to why she was denied a promotion—and specifically, whether she was not promoted to Manufacturing Engineering Manager because she is a woman. For the reasons that follow, the trial court was correct.

A.     *Governing Legal Principles and Aerovironment's Stated Reasons for Not Promoting Spann*

Section 12940, subdivision (a), provides that it is an unlawful employment practice for an employer, because of a person's sex or gender, "to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, or to discriminate against the person in compensation or in terms, conditions, or privileges of employment."

The responsibility of the moving defendant in a failure to promote case is to " 'clearly set forth, through the introduction of admissible evidence, the reason for the plaintiff's rejection.' " (*Addy v. Bliss & Glennon* (1996) 44 Cal.App.4th 205, 215-216,

12

italics added.)  Here, Aerovironment did so:  Through the declaration of Jon Self, it presented evidence that it decided not to replace outgoing Manufacturing Engineering Manager Steve Myers, but instead to consolidate two positions into one by transferring the Manufacturing Engineering Manager responsibilities to the Director of Quality, who also maintained his existing responsibilities.  It is undisputed that Spann never applied for the Director of Quality position, and that the Manufacturing Engineering Manager position was never posted or filled.

In an appropriate case, a plaintiff's assertions of discrimination may be shown to be without merit "where the job [plaintiff] sought was withdrawn and never filled." (*Guz, supra*, 24 Cal.4th at p. 354; see also *Horne v. District Council 16 Internat. Union of Painters & Allied Trades* (2015) 234 Cal.App.4th 524, 533 [quoting *Guz*]; *Chavez v. Tempe Union High School Dist. No. 213* (9th Cir. 1977) 565 F.2d 1087, 1091 ["Necessarily, the failure to prove the existence of a job opening is a fatal defect in a prima facie case of overt discrimination."].)  Accordingly, Aerovironment successfully met its burden to establish that it did not promote Spann for legitimate, nondiscriminatory reasons.

### B.      Spann's Evidence of Pretext/Discriminatory Animus

Spann concedes that the Manufacturing Engineering Manager position was never formally posted and a new Manufacturing Engineering Manager was not hired, but she suggests that Aerovironment's failure to post the position was itself evidence of discrimination.  Spann urges:  "Instead of officially opening the position, [Aerovironment] was able to avoid promoting a female (Spann) to manage the (mostly-male) manufacturing engineers by assigning those duties to another position – one for which defendants assumed Spann was not qualified and would not apply – the Director of Quality."

In support of her contention that Aerovironment never formally opened the Manufacturing Engineering Manager position to avoid promoting a woman, Spann cites her own testimony that Jon Self told her that she could apply for the Manufacturing Engineering Manager position "*when* it became available."  From this testimony, she

13

contends, "[a] jury could reasonably infer that Self's reference to 'when' the job was posted, as opposed to 'if,' meant that at the time of the interview, Self (and [Aerovironment]) *intended* the Manager position to be a standalone position, and *intended* to fill it. . . . A jury could also reasonably infer that had Spann not spoken to HR about her goals of promoting within the company, and had she not simultaneously expressed her concerns of company-wide gender bias, Self would have opened and filled the position. The fact that defendants eliminated the position, coupled with the timing of Spann's complaint to HR, raise[d] the logical inference that [Aerovironment] eliminated the position to avoid promoting (or avoid explaining its failure to promote) Spann."

We do not agree with Spann that Self's purported use of the word "when" in this context gives rise to a reasonable inference that Aerovironment eliminated a management position for the express purpose of keeping women out of management. As an initial matter, we note that when Spann first approached Self to express interest in the Manufacturing Engineering Manager position in October 2011, the position had been vacant for more than five months. There is no evidence that Aerovironment took any steps to fill the position at any point during that five month period. The decision not to replace Myers, therefore, was not an abrupt change of position following Spann's meeting with Self, but instead was a maintenance of the status quo.

Spann urges that a reasonable jury could infer anti-female bias from Self's tone during their October 2011 meeting, which Spann described as "demeaning." But Spann's perception of Self's tone during a single meeting cannot, by itself, support an inference of intentional discrimination. (See *McRae v. Department of Corrections and Rehabilitation* (2006) 142 Cal.App.4th 377, 396 ["[plaintiff's] personal beliefs or concerns are not evidence."].) Nor could a jury reasonably infer intentional discrimination from the fact that "nobody at [Aerovironment] informed her that the Director of Quality position was open, and nobody formally *or* 'informally' considered her for that position." The evidence is undisputed that Aerovironment publicly posted the Director of Quality position "so employees could see that it was available" between May 2011 and March

14

2012. Although Spann was not personally advised of the posting, neither was she prevented from accessing or reviewing it.[6]

For all of these reasons, none of Spann's proffered evidence raises a triable issue of material fact that Spann was not promoted because she is a woman. Accordingly, the trial court properly granted summary adjudication of Spann's causes of action for discrimination and failure to prevent discrimination.

## III.

## Retaliation and Failure to Prevent Retaliation

A.    *Governing Legal Principles*

Section 12940, subdivision (h) provides, in relevant part, that it is an unlawful employment practice for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part."

To establish a prima facie case of retaliation under FEHA, " 'a plaintiff must show "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." ' " (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 380; accord, *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).) Once an employee establishes a prima facie case, the employer

---

[6]    Spann asserts that there was pervasive gender bias at Aerovironment, but as we have said, she does not persuasively link such perceived bias to her failure-to-promote claim. We note, moreover, that not a single one of Spann's former co-workers testified that he or she had witnessed discriminatory treatment of Spann, and none of Spann's female coworkers testified that they themselves had experienced gender-based discrimination. Even the three declarations submitted by Spann in opposition to summary judgment did not provide any evidence of gender-based discrimination, stating only that the declarants' interactions with Spann had been positive and that they found her to be "friendly," "warm," "efficient," and "helpful." And, the undisputed evidence is that during the years relevant to this litigation, women held high-level positions at Aerovironment, including as Vice Presidents of Administration and Finance.

15

is required to offer a legitimate, nonretaliatory reason for the adverse employment action. If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation " ' " 'drops out of the picture,' " ' " and the burden shifts back to the employee to prove intentional retaliation. (*Yanowitz*, *supra*, at p. 1042.)

It is undisputed that Spann was terminated after she complained of gender bias to Human Resources Manager Sitler and filed complaints with the EEOC and DFEH. Aerovironment asserted, however, that it had "legitimate, nonretaliatory reason[s]" for Spann's termination—that the company was experiencing a reduced demand for its products, requiring a reduction in its workforce, and that Spann received the lowest numerical ranking of the five manufacturing engineers in her department.

Spann concedes that Aerovironment laid off a large number of employees, including UAS employees, as part of reductions in force in 2012 and 2013. She urges, however, that there was evidence that Aerovironment "used its ranking-system as a pretext for covering up its true motivation—getting rid of Spann because she reported the company to the EEOC."

It is well established that a reduction in force can be a legitimate reason to discharge an employee. (E.g., *Villanueva v. City Of Colton* (2008) 160 Cal.App.4th 1188, 1195 ["[T]he law is settled that an employer's depressed economic condition 'can be good cause for discharging [an] employee.' [Citation.]"]; see also *Guz*, *supra*, 24 Cal.4th at p. 358 [noting "employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process"].) However, "downsizing alone is not necessarily a sufficient explanation, under the FEHA, for the consequent dismissal of [a protected] worker. An employer's freedom to consolidate or reduce its work force, and to eliminate positions in the process, does not mean it may 'use the occasion as a convenient opportunity to get rid of its [protected] workers.' [Citations.] Invocation of a right to downsize does not resolve whether the employer had a discriminatory motive for cutting back its work force, or engaged in intentional discrimination when deciding which individual workers to retain and release. Where these are issues, the employer's explanation must address them. [Citation.]" (*Guz*, *supra*, 24 Cal.4th at p. 358.)

16

On the other hand, "if nondiscriminatory, [the employer's] true reasons need not necessarily have been wise or correct. [Citation.] While the objective soundness of an employer's proffered reasons supports their credibility . . . , the ultimate issue is simply whether the employer acted with *a motive to discriminate illegally*. Thus, 'legitimate' reasons ([*Tex. Dep't of Cmty. Affairs v.*] *Burdine* [(1981)] 450 U.S. [248,] 254 [101 S.Ct. at p. 1094]) in this context are reasons that are *facially unrelated to prohibited bias*, and which, if true, would thus preclude a finding of discrimination. [Citations.]" (*Guz, supra*, 24 Cal.4th at p. 358.)

With these principles in mind, we examine Aerovironment's evidence that it had a legitimate, nondiscriminatory reason for terminating Spann, and Spann's evidence that Aerovironment's true motivation for terminating her was retaliatory animus.

*B.      Aerovironment's Asserted Reasons for Terminating Spann*

Spann received a rating of 2.1 (out of 4) in "skills," 2.2 (out of 5) in "performance," and 1.6 (out of 3) in "attributes" in her pre-termination evaluation. In relevant part, the evaluation explained Spann's ratings as follows:

"Skills Comments:  Eileen has scored low (2 or 1) in almost all areas of this category.  She rarely communicates with others in the group and needed to be told to spend time on the manufacturing floor.  Her lack of leadership is exhibited through her lack of communication with her internal customers.  This also shows a lack of team support and almost no attention given to mentoring others."

"Performance Comments:  Eileen's responsiveness has been practically non-existent.  On many occasions, when issues arose on the manufacturing floor, she was not involved until someone located her and asked her to get involved and brought [her] 'up to speed.'  Again, team work is lacking as a result of her non-attendance to floor issues as they arise.  Timeliness suffers due to a lack of attention to current floor issues and as a result, efficiency is reduced."

"Attributes Comments:  Eileen has scored low in each area of this category.  She does not act like a self-starter; she needs to be 'pushed' to 'get things done.'  This shows a lack of customer focus, both internal and external.  She does not act like she 'owns' her

areas of responsibility and has shown little in the way of accountability. She does not seem to be personally invested in the business of [Aerovironment] and acts in a 'detached' and 'aloof' manner. As the senior engineer of the group, she should exemplify these attributes and work to create an environment where others in and outside of the group will want to come to her for guidance and support."

"[Summary]: Eileen only supports Tier II (all other work reassigned to others and sufficiently staffed.) Tier II program faces potential budget cuts that will eliminate the need for her position. This combined with her overall score of 2.0 and the reduction in a need for her lean manufacturing/analytical expertise with workload going forward leads to a recommendation that Eileen be RIF'd."[7]

In support of its motion for summary judgment, Aerovironment submitted portions of the deposition testimony of Spann's supervisor, Bud Jenkins. Jenkins said that Spann's pre-termination ranking was "based on the information I had at the time[,] which included input from peers, other managers, as well as my review of daily activity logs, and also my own observations throughout . . . a little over a year." Jenkins said Spann was aloof with other employees and did not adequately attend to issues that arose on the manufacturing floor. He explained: "[I]n general trying to find resolution to issues as quickly as possible would require that you're [on the manufacturing floor] pretty much all the time throughout the day. And that – that was not the case. . . . [Spann] had to be sought out. She had to be notified more times than not that there was an issue. And that's not really acceptable in terms of how a senior engineer would react and respond within that manufacturing environment."

Jenkins also noted that Spann regularly missed morning meetings: "Eileen Spann was supposed to be on the floor first thing in the morning for the morning walk-throughs. And then periodically on a regular basis throughout the day, understanding what the issues were within her area of responsibility. Had she been in attendance at all of those

---

**7** "RIF" is an acronym for "reduction in force." A person laid off during a reduction in force is sometimes said to have been "RIF'd."

morning meetings she would have known what the issues were that were being discussed. . . . [However, she missed] the majority of them."

Jenkins also noted that he received frequent complaints from Spann's coworkers that she was difficult to work with or was not completing her work: "[There] seemed to be an overall unwillingness to – on a regular basis over time to be a part of the team and to try to work with others effectively and efficiently. [¶] I had received numerous complaints, verbal complaints, as well as written, through email, complaints, on that topic. It was not uncommon for people to show up at my door, walk in, close the door, and say can I have a word with you[?] . . . And then they would begin to tell me about something that happened or some situation there where it was . . . uncomfortable for them to perform their duties as a result of interaction or noninteraction with [Spann]." Jenkins said that many members of Spann's group had complained about her, including several female coworkers. For example, Jenkins recalled Ashley Harrier "coming into my office, and saying I keep asking Eileen for this information, and she's nonresponsive, and it's putting me in a very uncomfortable position." Similarly, Laurie Morrow told Jenkins that Spann's work "is not accurate and complete." Jenkins added, "And there had been errors noted and Laurie would have to go back and make the corrections and do whatever updates were required to get back on track."

Jenkins also described complaints from employees outside Spann's group: "One issue was where is she. She's not here. And another issue was she's not pulling her weight, staying on top of the . . . workload." Because Spann was not completing her work, "Laurie [Morrow] was having to do a lot of the work that [Spann] was supposed to be doing. Which was taking Laurie away from doing the work that she needed to do. And it was causing her to work a significant amount of hours beyond what would normally be expected."

Aerovironment also submitted portions of the deposition transcript of Laurie Morrow, who testified that Spann was not easy to work with because she was not a "team player": "When we had documents we needed to create, we were supposed to work together to create them, and she left it to me even when I asked for her help." Morrow

19

said Spann did not communicate when she was going to be absent from work, did not interact with people in the field, and did not share the burden of what was happening on the production floor. Morrow explained that a manufacturing engineer typically spends the majority of his or her time on the manufacturing floor to "learn the important details of how things go together." Morrow complained to Bud Jenkins about Spann because in Morrow's judgment, Spann "wasn't performing her job."

C. *Spann's Evidence of Pretext/Retaliatory Animus*

1. Inconsistent performance evaluations

Spann contends that her low pre-termination ranking was pretextual because it was inconsistent with earlier evaluations of her work. She notes that in 2011, "taking initiative" was identified as one of her strengths, while the pre-termination evaluation gave her low marks "for not being a self-starter." Similarly, Spann's integrity was noted as a strength in her 2011 evaluation, but she was rated a "2" (meets some expectations) in this category immediately prior to termination.

We do not agree with Spann that comparing the 2011 and 2013 evaluations gives rise to a reasonable inference that the 2013 evaluation was retaliatory. As an initial matter, *both* evaluations (which were finalized in April 2012 and May 2013, respectively) followed Spann's internal complaint of gender discrimination. Logically, therefore, if Aerovironment had been motivated by retaliatory animus, such animus would have colored the 2011 evaluation, as well as the evaluation that immediately preceded Spann's termination.

Moreover, the annual performance reviews (referred to as "Personal Development Process" or "PDP") were structured very differently than the rankings prepared in anticipation of layoffs. The PDPs were filled out initially by the employees, and only later by supervisors; they sought information such as "[w]hat skills does the employee currently possess," "[w]hat skills does the employee need to work on in the future," "[w]hat individual attributes are strengths for the employee," "[w]hat [i]ndividual [a]ttributes does the employee need to improve," "[w]hat experience and skills has the employee gained during the past year," "[w]hat are the employee's most valuable

20

contributions," "[w]hat is the employee's growth direction," and "[w]hat additional tools, skills, education or experience does the employee need to help accomplish this growth path?" In contrast, the pre-termination rankings were filled out by supervisors only, and asked for numerical rankings in categories such as "diagnostic," "communication," "technical workmanship," "decision making," "leadership," "conflict resolution," "floor support," "team support," "timely execution of duties," "responsiveness," "innovation," and "teamwork."

Finally, the 2011 and 2013 evaluations were largely consistent. The 2013 evaluation rated Spann "2" ("fair") in leadership; the 2011 performance review said, among other things, that Spann should "work to improve [her] leadership skills." The 2013 evaluation rated Spann "1" (poor) in conflict resolution, and "2" (fair) in communication, mentoring others, team work; the 2011 performance review suggested that Spann "hone the skill of getting buy in from peers," "improve her flexibility," and "not get frustrated when her ideas are not immediately accepted or implemented."[8]

### 2. Insufficient time on manufacturing floor

Spann contends that Aerovironment's assertion that she spent insufficient time on the manufacturing floor was a pretext for discrimination because during her last two months at Aerovironment, "she was literally on that [manufacturing] floor." Spann says: "Regarding the Tier II floor, [I] was *always* available, because [I] was literally on that floor. . . . Thus, a jury could reasonably conclude that Jenkins was not credible when claiming that a Tier II coworker reported to Jenkins, 'where is she?' "

We do not agree that a jury reasonably could infer pretext from Aerovironment's statement that Spann spent insufficient time on the manufacturing floor. While it is undisputed that Spann's desk was near the "Tier II" manufacturing area, Spann herself conceded that she spent only about 20 percent of her time in the manufacturing area itself. She testified that she spent the rest of her time "at my desk on my computer" and

---

[8]     Some of these comments appeared in the initial version of the 2011 performance review, but were subsequently removed at Spann's request.

"[i]f someone needed me on the floor they could come to my cubicle, send me an e-mail or phone me." Spann's testimony thus was entirely consistent with Jenkins' statements that Spann was not in the manufacturing area "throughout the day," and that she "had to be sought out" when an issue arose.

The real dispute between Spann and Aerovironment, therefore, is not how much time Spann *actually* spent in the manufacturing area, but how much time she *should* have spent there. As we have said, Jenkins testified that to be effective, a manufacturing engineer had to be in the manufacturing area "pretty much all the time throughout the day." Laurie Morrow gave similar testimony; she said that a manufacturing engineer's primary role is to "work with the engineers and the production floor," and that doing so requires being "[o]n the production floor." Although Spann disagreed about the necessity of spending significant time in the manufacturing area, her disagreement is insufficient to create a triable issue of material fact. " '[A]n employee's subjective personal judgments of his or her competence alone do not raise a genuine issue of material fact.' (*Horn* [*v. Cushman & Wakefield Western, Inc*. (1999)] 72 Cal.App.4th [798], 816.)" (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 76; see also *Fercello v. County of Ramsey* (8th Cir. 2010) 612 F.3d 1069, 1080 ["Absent some evidence of retaliatory motive, we will not second-guess an employer's judgment of an employee's performance."]; *Gilbert v. Des Moines Area Community College* (8th Cir. 2007) 495 F.3d 906, 916 [" '[T]he employment-discrimination laws have not vested in the . . . courts the authority to sit as super-personnel departments reviewing the wisdom and fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination.' "].)

### 3. Altered time records

Spann suggests that there is evidence that some of her time records were altered, and a jury reasonably could conclude that Aerovironment deliberately altered the records in order to make her look less productive than she actually was. In this regard, Spann asserts that (1) Daily Activity Logs produced during discovery "inexplicably omitted several entries showing work Spann performed," and (2) several timecard entries

22

"inaccurately reflected Spann leaving work significantly earlier than she did." Spann urges that these discrepancies "are significant, and made Spann appear less professional, less motivated, and less committed to [Aerovironment] than she was."

We do not agree that the time card inaccuracies Spann highlights reasonably support an inference that Aerovironment altered such records to justify Spann's termination. As an initial matter, Spann concedes in a footnote that Aerovironment acknowledged that there had been a "computer glitch" during discovery, and that it produced accurate records when notified of the discrepancies. Further, Spann identifies only four Daily Activity Logs (March 1, 4, 5, 6, 2013) that she believes were altered, and only four time cards (April 5, 2013; March 12, 2013; July 27, 2012; October 27, 2011) that she believes document her leaving earlier than she actually did. These asserted discrepancies are de minimis in the context of Spann's three and a half years of employment at Aerovironment; and, in any event, Aerovironment never cited these documents as a reason to terminate Spann.

### 4. Manufactured paper trail

Spann suggests that Aerovironment manufactured a "paper trail" to justify her termination by soliciting negative feedback from coworkers. In support, she relies on a January 2013 email from Sitler to product engineer James Campbell, as well as several emails from Laurie Morrow to Jenkins from which Spann suggests a jury could infer "that Jenkins had asked Spann's co-worker to essentially spy on Spann and report any negative information to him."

We do not agree that these emails can reasonably be interpreted as Spann suggests. The email from Sitler is, on its face, a follow-up to an earlier conversation about Spann's performance, seeking feedback as to "how [Spann] is performing," "[h]ow is she responding to you," and "what level is she supporting your program[?]"[9] The emails

---

[9] In full, the email says as follows: "A couple of months ago I had spoken to you regarding Eileen and how things were going, how she was supporting your programs, and how you were professionally getting along. You stated in that conversation that she had improved the professionalism she displayed in your responses, such as being more

23

from Laurie Morrow discuss Spann's performance, but contain no suggestion that Jenkins had asked Morrow to "spy" on her.

     5.     Reduced need for "lean manufacturing" expertise

Spann suggests that a jury reasonably could infer that Aerovironment's "alleged[] '. . . reduc[ed] need for [Spann's] lean manufacturing/analytic expertise' " was pretext because "a company that was facing budget cuts so substantial that it had to undergo three rounds of workforce reductions[] would require an *increase*, not a *decrease*, in money-saving opportunities, such as LSS [Lean Six Sigma]."[10] Not so. Contrary to Spann's suggestion, there is no logical reason why a company manufacturing *fewer* products would have an *increased* need for manufacturing efficiency. Moreover, "if nondiscriminatory, [an employer's] true reasons need not necessarily have been wise or correct." (*Guz*, *supra*, 24 Cal.4th at p. 358.) Therefore, we "will not be drawn into an extended examination of the sufficiency of the evidence to support each stated reason for [Spann's] termination." (*McGrory v. Applied Signal Technology, Inc.* (2013) 212 Cal.App.4th 1510, 1533.)

---

responsive and less abrasive. You also mentioned that she is responding more. When we discussed the responsiveness, you mentioned that you were still very involved in the work she is doing. You felt that you needed to give her a lot of direction in order to complete the assignment. When we discussed the level of work she was performing, you felt that based on the questions and the amount of help you were providing that it was well below what would be expected of a Manufacturing Engineer Sr. You also stated that at that point the amount of work you were assigning her was less than full time. However, you were about to give her a number of tasks. When we spoke, I asked that you continue to be supportive and helpful, however, that you were more hands off with the assignments that you were giving to her. This was in an effort to allow Eileen to use her education and experience to perform at a level equal to her position level and allow us to see her performance and better understand her capabilities. [¶] At this time, I wanted to follow up with you to see if you were able to give her more responsibility. If not, why [not]. Also, to ask how she is performing. How is she responding to you and what level is she supporting your program. Or if something has changed and you are not utilizing her any longer. [¶] Thank you for your honest and complete assessment."

[10]     Spann asserts that she was the "resident expert" in the area of lean manufacturing, including "Lean Six Sigma," which Spann said is " 'all about cutting costs, saving money, [and] efficient operation.' "

24

For all of these reasons, there are no triable issues of material fact as to Spann's causes of action for retaliation or failure to prevent retaliation.  Summary adjudication of these causes of action was properly granted.

## DISPOSITION

The judgment is affirmed.  Aerovironment is awarded its appellate costs.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


EDMON, P. J.


We concur:



ALDRICH, J.



JONES, J.*

_____

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.